UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

SCHERIE S. MURRAY,

              Plaintiff,

-against-

ANDREW CUOMO, as Governor of the State of
New York, BOARD OF ELECTIONS IN THE CITY
OF NEW YORK, JOSE MIGUEL ARAUJO,
MIGUELINA CAMILO, GINO A. MARMORATO,
MICHAEL MICHEL, SIMON SHAMOUN,
TIFFANY TOWNSEND, JOHN ZACCONE, as
Commissioners, Board of Elections in the City of
New York, NEW YORK STATE BOARD OF
ELECTIONS, PETER S. KOSINSKI, DOUGLAS A.
KELLNER, ANDREW J. SPANO, as
Commissioners, New York State Board of Elections,

              Defendants.

</td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/16/2020__

1:20-cv-03571-MKV

OPINION & ORDER DENYING
TEMPORARY RESTRAINING
ORDER

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff, an active member of the Queens Republican Party, seeks to challenge certain

modifications to the New York Election Law put in place as a result of the COVID-19 pandemic

which she claims violate her constitutional rights.  Ms. Murray seeks to stand for nomination as

the Republican Party candidate for New York's Fourteenth Congressional District.  In brief, she

challenges certain modifications to ballot-access provisions of the election law (specifically,

reducing the number of days she had to gather signatures, but not the corresponding modification

to reduce the number of signatures required to appear on the ballot), and her failure to meet the

revised requirements, on the ground that they violate her rights to stand as a candidate in the June

23, 2020 primary election.  Of particular importance, this is Ms. Murray's second attempt to use

the courts to have her name placed on the June 23 ballot. Previously, Ms. Murray filed an action

in New York Supreme Court, Bronx County, in which she unsuccessfully asserted substantially

the same claims she asserts here together with other claims based on New York Election Law. *See In re Murray v. Hanratty*, Case No. 260205/2020 (N.Y. Sup. Ct. Bronx Cty.).[1]

The Complaint in this case [ECF #4] ("Cpl.") was filed on May 7, 2020, a full seven weeks after the modifications to the Election Law were made.  Along with the Complaint, Plaintiff filed a proposed order to show cause and request for a temporary restraining order, supported by a memorandum of law [ECF #3, Ex. A] ("Pl. Br."), an affirmation from Plaintiff's counsel [ECF #2, Ex. 1] (the "St. Paul Affidavit") and an affidavit sworn by the Plaintiff.  [ECF #3, Ex. B.] ("Murray Affidavit").  By her application, Plaintiff seeks a declaration of her rights and an injunction ordering the New York State and City Boards of Elections to place her name on the ballot and ordering those bodies not to print or distribute ballots without her name on them.  The next day, the Court issued a modified order to show cause, calling for Defendants to respond and setting a hearing on Plaintiff's injunctive relief application [ECF #6].  On May 12, 2020, Defendants each filed a response.  First, Defendants Andrew Cuomo, the New York State Board of Elections, and the commissioners of that body (collectively the "State Defendants") filed a memorandum of law [ECF #10] (the "State Opp."), along with a Declaration of counsel with supporting exhibits [ECF #10, Exs. 1-2] ("Conrad Decl.").  Second, the New York City Board of Elections and the commissioners of that body (the "City Defendants") filed a letter response with several supporting exhibits [ECF #8] (the "City Opp.").  On May 13, 2020, the Plaintiff filed a reply brief [ECF #12] (the "Reply Br.") and an affirmation of counsel with exhibits [ECF #11] ("Reply Aff.").  The Court heard argument on the application on May 15, 2020 (the "May 15 hearing").

---

[1] Select filings from the state court action are attached as an exhibit to the Declaration of Matthew Conrad, submitted in support of the State Defendants' opposition to Plaintiff's application.  *See* ECF #10, Exs. A-B.

Upon review of the Plaintiff's motion for a temporary restraining order and supporting papers, Defendants' materials submitted in opposition, and the parties' arguments during the May 15 hearing, and after due consideration, the Motion for a temporary restraining order is DENIED. This opinion supplements the Court's ruling on the record at the May 15 conference.

## **BACKGROUND**

The Court assumes the truth of the facts as stated in Plaintiff's complaint. *See Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 362 (2d Cir. 2003).

Plaintiff is a Jamaican-born resident of Queens, New York who has been a registered member of the Republican Party since 2009. Cpl. ¶ 11, 13. In addition, Ms. Murray has stood as the Republican candidate for multiple state offices, and has been involved in the executive leadership of the Queens Republican Party. Cpl ¶ 14-18. In 2019, Plaintiff decided that she would like to run as the Republican Party candidate for U.S. Congress from New York's Fourteenth Congressional District, a district comprising parts of both Queens and Bronx counties. Cpl. ¶ 21. Leadership of the Queens Republican Party, however, disapproved of this plan and instead recommended that Ms. Murray seek the Republican Party nomination for New York's Fifth Congressional District, located in Queens and Nassau counties. Cpl. ¶ 22. The Queens Republican Party conditioned their institutional support of Ms. Murray on her seeking nomination for the Fifth District, and not the Fourteenth. Cpl. ¶¶ 22, 27.

Undeterred by the loss of institutional party support, Plaintiff resolved to seek a place on the ballot on her own. To appear on a primary ballot in New York, state law prescribes that a candidate must submit a "designating petition" which includes a certain number of signatures of registered members of the candidate's party. *See* N.Y. Election Law § 6-132(1), 6-136. For a primary election, the Election Law provides that a candidate must collect a number of signatures

equal to five percent of the registered members of the party in the relevant political unit (*e.g.*, congressional district, council district, ward, or statewide).  *See* N.Y. Election Law § 6-136.  All signatures must be witnessed by another registered member of the candidate's party.  *See* N.Y. Election Law § 6-132(2).  Additional information about each signer (for example, address and date of signature) is required, *see* N.Y. Election Law § 6-130, and certain restrictions also apply to designating petitions as a whole (for example, requiring "wet" signatures and certain restrictions on how to correct misinformation).  *See* N.Y. Election Law § 6-134.  Candidates must file their designating petitions with the Board of Elections on a time frame set forth in state law.  *See* N.Y. Election Law § 158(1) ("A designating petition shall not be filed earlier than the thirteenth Monday before, and not later than the twelfth Thursday preceding the primary election.").  Signatures on the designating petitions may not be dated (and indeed, no candidate may collect signatures) more than thirty-seven days before the last day to file the designating petition.  *See* N.Y. Election Law § 6-134(4).  Following the candidate's filing of his or her designating petition, any voter eligible to vote in the election in question may file objections to the designating petition.  *See* N.Y. Election Law § 6-152(2).  The local board of elections (in this case, the Board of Elections in the City of New York) will review and pass judgment on any objections.  That determination by the Board of Elections is subject to judicial review by the New York Supreme Court, the decision of which is then appealable in the normal course.  *See* N.Y. Election Law §§ 6-154, 16-102

All parties agree that the outbreak of the COVID-19 pandemic caused unprecedented disruption to New Yorkers' daily lives and the functioning of government.  In response to the pandemic, Defendant Andrew Cuomo, Governor of New York, issued a series of executive orders aimed at containing the spread of the disease.  Among them, on March 14, 2020, Cuomo

issued Executive Order 202.2 which reduced the amount of time available to collect designating petition signatures.  Cpl. ¶ 37.  The original last day to collect signatures was April 2, 2020; Executive Order 202.2 set the new deadline as March 17, 2020.  *Id.*  The Executive Order also made a corresponding reduction in the number of signatures—from five percent of the registered party members in the district to one and one-half percent—required for a designating petition under Section 6-136 of the New York Election Law.  Cpl. ¶ 38.  The effect was to reduce the number of signatures Plaintiff was required to collect from 1,250 to 375.  Cpl. ¶ 48; *see also* State Opp. at 20-21.  On March 18, the New York State Legislature passed, and the Governor signed, legislation which ratified the Governor's order and constituted a formal change to the Election Law.  Cpl ¶ 40; *see also* State Opp. at 7-8.  In addition to those measures, the legislation also set a new deadline of March 20, 2020 for submission of designating petitions to the Board of Elections and eliminated "the option to file an opportunity to ballot petition in the June 2020 primary election."  Cpl. ¶ 40.

Because Executive Order 202.2 was issued on March 14, Plaintiff had only three days remaining to finish collecting signatures for her designating petition before the new March 17 deadline.  Cpl. ¶ 41.  She states that as a result of other COVID-19 response measures, including the Governor's stay-at-home order, she was unable to gather any additional signatures between March 14 and March 17.  Cpl. ¶ 41-42.  Consistent with the new deadlines, Plaintiff filed her designating petition with the New York City Board of Elections on March 20, 2020.  Cpl. ¶ 43.  When it was filed, Plaintiff's designating petition contained 906 purportedly valid signatures, well in excess of the newly reduced number required.  *Id.*

Following Plaintiff's filing of her designating petition, two voters filed objections to Plaintiff's designating petition with the New York City Board of Elections.  Cpl. ¶ 44-46.

Contemporaneously, two petitions for judicial review were filed in the Bronx County Supreme Court, one seeking to validate, and the other to invalidate, the signatures on Plaintiff's petition.[2] While those state court cases remained pending, the New York City Board of Elections released a "Clerk's Report" (*i.e.* a non-final decision regarding the number of valid signatures on the petition), finding that none of the signatures on Plaintiff's designating petition were valid. Cpl. ¶ 48. Both Plaintiff and the objectors were permitted to review the report and file objections, which were set to be reviewed by the New York City Board of Elections at a hearing on April 21, 2020. Cpl. ¶ 50; *see also* City Opp. at 3. At that hearing, the New York City Board of Elections adopted the Clerk's Report and ruled that Plaintiff's designating petition contained no valid signatures.[3]

Plaintiff then proceeded with the state court case that had been filed in Bronx Supreme Court. The case, an Article 16 proceeding,[4] was heard by Justice John W. Carter, whom Defendants noted was assigned to hear all election cases in The Bronx. In that proceeding, Plaintiff was represented by the same counsel representing her here. In state court, Plaintiff raised arguments both that the signatures she gathered were valid and that Executive Order 202.2

---

[2] Plaintiff refers in her complaint only to one of the petitions filed in court, filed on April 2, 2020, by an objector seeking to invalidate the signatures on her designating petition. *See* Cpl. ¶ 47. Defendants refer only to one petition, filed by Plaintiff on April 2, 2020 to validate her designating petition. *See* State Opp. at 9; City Opp. at 4. Attached to the Reply Affirmation in support of Plaintiff's Motion are transcripts from both of the cases, with each bearing its own New York state court docket number. *See* Reply Aff., Exs. A, B. However, the state court decision, which the State Board of Elections submitted as part of its Opposition, bears the docket number of only the case initiated by Plaintiff. *See* Conrad Decl., Ex. A at 2.

[3] Plaintiff submits that she was excluded from the hearing, which occurred electronically due to the COVID-19 pandemic. *See* Cpl. ¶ 50. Specifically, Plaintiff's counsel claims that he was unable to dial into the hearing despite assurances that he could do so up to ten minutes after the scheduled start time. *Id.* The New York City Board of Elections, however, notes that Plaintiff appears to have gotten the time of the hearing wrong, and therefore did not appear at the hearing due to counsel's own error. *See* City Opp. at 3. Plaintiff does not refute or otherwise respond to this contention in her Reply.

[4] "Article 16 proceedings" are specialized court proceedings brought under Article 16 of the New York Election Law. Unlike a plenary state court action, the jurisdiction of the Article 16 proceeding is limited to claims relating to certain election-related issues, including designation and nomination of candidates. *See* N.Y. Election Law § 16-100, *et seq.*

6

violated her constitutional rights.  *See, e.g.*, City Opp. at 4 ("The verified petition only sought a review of the Board's determinations as to the invalidity of signatures. Thereafter, petitioner (plaintiff here) filed a memorandum of law asserting that [Executive Order] 202.2 violated, among other things, the First and Fourteenth Amendments to the Constitution.").  Plaintiff admitted at the May 15 hearing that including these arguments for the first time in the memorandum was unwise, but that they were raised nonetheless.  The Supreme Court rejected Plaintiff's arguments and held the signatures invalid.  *See* Conrad Decl., Ex. A at 2-5 (hereinafter, the "State Court Decision").  Specifically, the State Court found that the cover sheet to Plaintiff's designating petition contained technical violations which made it invalid.  *See* State Court Decision at 2.  More importantly, however, the State Court also ruled Plaintiff's signatures invalid because all of them were collected and witnessed by a person who was not a member of the Republican Party.  *Id.* at 2-3; *see also* N.Y. Election Law 6-132(2).  In so holding, the Court denied Plaintiff's request to order the Board of Elections to place her on the ballot for the June 23, 2020 primary, the identical relief she now seeks in this Court.

Plaintiff did not appeal the decision.  Counsel claimed that he was unaware that any decision had been entered until the State Defendants submitted the decision to this Court with their opposition papers.  At the May 15 hearing, Defendants asserted that the decision was publicly available on a Bronx Supreme Court website before this case was filed.  Regardless, Plaintiff had an obligation to diligently monitor and inquire about a decision, especially given the limited timetable for appealing pre-election Article 16 cases.[5]  Rather than appealing from the state court decision, Plaintiff thereafter filed this case.

---

[5] All counsel agreed at the May 15 hearing that the New York Court of Appeals and Appellate Divisions had released a consolidated calendar in early March specifying the dates on which the courts would hear election-related appeals.  Appeals from Bronx Supreme Court were heard by the Appellate Division, First Department on May 12, 2020, with the Court of Appeals scheduling time to hear appeals, if any, on May 19, 2020.  *See Notice to the Bar:*

In this case, Plaintiff seeks a declaration that her constitutional right to seek elective office was violated by the Governor's Executive Order 202.2 and the legislation passed thereafter.  Cpl. ¶ 1.  In addition, she seeks an injunction ordering Defendants to place her name on the ballot for the June 23, 2020 primary election and, as a corollary, prohibiting Defendants from printing or distributing ballots that do not include Plaintiff's name.  Cpl. ¶¶ 57, 63.  In opposition to the application for a temporary restraining order, Defendants argue, first, that the Plaintiff's case is not properly before the Court, either by application of the *Rooker-Feldman* doctrine or because of res judicata.  State Opp. at 12-17; City Opp. at 4-5.  Second, Defendants argue that Plaintiff has failed to meet the standard required for any emergency injunctive relief. State Opp. at 17-25; City Opp. at 5-6.

## DISCUSSION

Plaintiff seeks a temporary restraining order to protect from what she submits is imminent irreparable harm if her name is not included on the June 23, 2020 primary ballot. However, the Court should not consider the merits of the Motion if it lacks jurisdiction or is barred from hearing the case for another reason.  *See Seibel v. Frederick*, Case No. 20-cv-02603 (PAE), 2020 WL 1847792, at *2 (S.D.N.Y. Apr. 13, 2020) ("as is true of civil actions generally, an independent basis for asserting federal question or diversity jurisdiction must be shown, in order for a court to grant preliminary relief." (citing *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 383-84 (E.D.N.Y. 2016)) (internal quotation marks and alteration omitted))).

As discussed further below, the Court finds that no barrier to consideration of Plaintiff's motion exists, because the *Rooker-Feldman* doctrine is inapplicable here, and because there is

*Primary Election Appeals*, Court of Appeals of the State of New York (March 11, 2020).  Plaintiff's counsel conceded at the May 15 hearing that he was well aware of these appeal schedules.

not a fully developed record to enable the Court to rule on the application of res judicata. However, the Court concludes that Plaintiff has not met the burden required to justify a temporary restraining order in this case.

## I.     Doctrines Which May Preclude Review

Defendants argue that this Court's review of the merits of Plaintiff's request is barred by the *Rooker-Feldman* doctrine and/or res judicata.  Upon review, the Court finds that the *Rooker-Feldman* doctrine does not bar the claims asserted here because Plaintiff's alleged harm was not caused by the decision of the Bronx Supreme Court.  The Court does not decide the applicability of res judicata, but notes that it may bar further proceedings in this case.

### A.     *Rooker-Feldman* Doctrine

*Rooker-Feldman* is a judicial rule derived from the implication of 28 U.S.C. § 1257. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005); *see also D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); 18B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Jurisdiction* § 4469.1 (2d ed.).  In short, the doctrine holds that because Section 1257 only grants appellate jurisdiction over state court cases to the United States Supreme Court, lower federal courts lack subject matter jurisdiction to review state court decisions or judgments.  *Exxon Mobil*, 544 U.S. at 291-92.  However, the Supreme Court has also cautioned, and this Circuit has reiterated, that the scope of the *Rooker-Feldman* doctrine is exceedingly narrow.  *See Exxon Mobil*, 544 U.S. at 283-4; *Sung Cho v. City of New York*, 910 F.3d 639, 644 (2d Cir. 2018) (noting that in *Exxon Mobil* the Supreme Court has "considerably narrow[ed] the [*Rooker-Feldman*] doctrine").  Indeed, the doctrine now serves to bar only federal court suits that complain of "injuries caused

by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284.

Following *Exxon Mobil*, the Second Circuit developed a four-part test to determine whether *Rooker-Feldman* applies in a given case.  Specifically, in order for the doctrine to bar a subsequent federal court action "(1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced."  *Sung Cho*, 910 F.3d at 645 (citing *Hoblock v Albany Cty. Bd. Of Elections*, 422 F.3d 77, 85 (2d Cir. 2005).  Among the elements of the test, the Circuit has instructed that "the second requirement—that the plaintiff complains of an injury caused by a state-court judgment—is the 'core requirement from which the other[] [*Rooker-Feldman* requirements] derive.'" *Id.* at 646 (citing *Hoblock*, 422 F.3d at 87).  "[A] federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it."  *Hoblock*, 422 F.3d at 88.  The Second Circuit's narrow rule about the application of *Rooker-Feldman* comports with the views of other Circuits on the limited scope of the doctrine.  *See, e.g.*, *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397 (6th Cir. 2020); *Hulsey v. Cisa*, 947 F.3d 246 (4th Cir. 2020); *In re Phila. Entm't & Dev. Partners*, 879 F.3d 492 (3d Cir. 2018); *Mayotte v. U.S. Bank Nat'l Ass'n*, 880 F.3d 1169 (10th Cir. 2018).

Here, Plaintiff's alleged injury was not caused by a state court judgment.  As pleaded in the Complaint, the Plaintiff's injury is the purported denial or abridgment of her constitutional right to "seek elective office."  Cpl. ¶ 1; *but see* Pl. Br. at 21-22 (discussing the right to vote and

for voters to be able to express their rights through voting for any candidate they chose).  While the effect of Plaintiff's state court proceeding was that she would not be placed on the ballot, that decision merely "ratified" or "acquiesced in" the decision of the New York City Board of Elections to invalidate Ms. Murray's petition signatures under various provisions of New York Election Law and, as a result, find her not eligible to be placed on the ballot.  Put another way, the state court decision declining to order her to be included on the ballot did not cause her not to appear on the ballot.

Plaintiff does not invite this Court to review and reject the state court judgment which found that there were technical deficiencies in her designating petition and that all of her signatures were invalid.  Rather, she asks this Court to direct that she be placed on the ballot notwithstanding that finding.  This factual scenario does not fit within the strictures of the *Rocker-Feldman doctrine*.

### B.        Res Judicata

The State Defendants also argue that if not barred by *Rooker-Feldman*, Plaintiff's claims are precluded by res judicata because Plaintiff raised her constitutional claim in Bronx Supreme Court.  *See, e.g.*, State Opp. at 15-17; *see also* State Court Decision at 3.  The Court examines the issue here because the parties have addressed the it.  Though on the present record, the Court at this time that preclusion doctrines prevent adjudication of Plaintiff's application.[6]

Res judicata, or, here specifically, claim preclusion, "prevents a plaintiff from raising a claim that was or could have been raised in a prior suit."  *McKithen v. Brown*, 481 F.3d 89, 104

---

[6] Importantly, not all of the filings submitted in the state court proceeding have been filed in this Court.  Notably, Plaintiff's memorandum of law raising the constitutional claims was not filed.  In light of that the Court cannot fully consider the preclusive effects of that case.  *See, e.g.*, *Carbonell v. Louisiana Dept. of Health and Human Resources*, 772 F.2d 185, 189 (5th Cir. 1985) (court may dismiss case *sua sponte* on the grounds of res judicata where it has "all relevant data and legal records").

(2d Cir. 2007); *accord* 18 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure: Jurisdiction* § 4403 (3d ed.) (noting the "purpose and effect" of res judicata to be that it "preclude[s] relitigation of matters that have been litigated previously or [] preclude[s] any litigation of matters that should have been litigated previously."). A decision or judgment from one court will preclude the same claims from being raised in a second, separate case, even if an appeal of the first decision is pending or available. *Id.* at § 4433.

The federal Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to "accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state." *Hoblock*, 422 F.3d 93. There is "no discernible difference" between federal rules about res judicata and the rules of New York State. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). Thus, for res judicata to apply here, the Court must find "(1) an adjudication on the merits in the previous action; (2) that the previous lawsuit involved the same parties, or those in privity with them; and (3) that the claims asserted in the subsequent suit were raised, or could have been raised, in the prior proceeding." *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 562 (S.D.N.Y. 2016) (citing *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000)). However, "'[r]es judicata does not require the precluded claim to actually have been litigated.'" *Kamdem-Ouaffo*, 160 F. Supp. 3d at 564 (quoting *EDP Med. Computer Sys., Inc. v. U.S.*, 480 F.3d 621, 626 (2d Cir. 2007)), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016). Instead, res judicata bars claims that "were or could have been raised," "not only as to what was pleaded but also as to what could have been pleaded." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981); *In re Teltronics Servs., Inc.*, 762 F.2d 185, 193 (2d Cir. 1985).

At least some of the same parties who are before this Court—Plaintiff and the New York City Board of Elections—were involved in the prior state court action. That action also

proceeded to a merits-based appealable decision on the Plaintiff's claims. *See* State Court Decision at 3-4. While Plaintiff did not appeal that decision, the ruling still may have preclusive effect in another case involving the same claims. Significantly, all parties agree, and Plaintiff confirmed at the May 15 hearing, that Plaintiff initially raised her constitutional claims in the Supreme Court proceeding. *See* City Opp. at 4, State Opp. at 16, Reply Br. at 1-2; *see also* Reply Aff. Exs. A, B (discussing the constitutional claims in the context of removal). The Parties disagree about whether the claims actually "could have been raised" in the state proceeding. Plaintiff now submits that the state court does not have jurisdiction to consider her constitutional claims in an Article 16 proceeding, and as a result she cannot be penalized for raising there claims that were ultimately futile. *See* Reply Br, at 1-3.[7]

A review of New York law suggests that constitutional claims may be asserted in New York State Article 16 proceedings. The statute setting forth the jurisdiction of Article 16 judicial proceedings grants broad jurisdiction to the New York Supreme Court. "The supreme court is vested with jurisdiction to summarily determine any question of law or fact arising as to any subject set forth in this article, which shall be construed liberally." N.Y. Election Law § 16-100(1). New York Election Law specifically provides that "The nomination or designation of any candidate for any public office or party position or any independent nomination . . . may be contested in a proceeding instituted in the supreme court by any aggrieved candidate, or by the chairman of any party committee or by a person who shall have filed objections." N.Y. Election

---

[7] Plaintiff also argues that the State Supreme Court Justice indicated he did not have jurisdiction to decide the federal constitutional issues. For support Plaintiff points to two short transcripts of proceedings where removal of the state case to federal court was discussed. *See* Reply Aff., Exs. A, B. A review of those transcripts shows that the judge himself never suggested he had no jurisdiction. Instead, a New York City Board of Elections representative suggested it, *see* Reply Aff., Ex. A at 5:3-6, and Plaintiff's counsel stated he would seek removal of the case to federal court before the Court opined on the issue. *Id.* at 5:7-8, 7:5-6. The final decision in the case did not consider Plaintiff's constitutional claims because the judge found that other state law grounds denied Plaintiff's relief. *See* State Court Decision at 3.

Law § 16-102(1).  This grant of jurisdiction would appear to encompass all claims regarding the nomination or designation of a candidate, including alleged constitutional violations, and not simply those relating to the technicalities of signatures on a petition.

Indeed, several New York cases support this conclusion.  For example, New York state courts have previously held that constitutional challenges to a candidate's ability to appear on the ballot (due to residency requirements) must be brought in an Article 16 proceeding.  *See Scaringe v. Ackerman*, 119 A.D.2d 327, 328-39 (N.Y. App. Div. 3d Dep't 1986).  Additionally, the New York Court of Appeals has held that it has jurisdiction over constitutional challenges to the Election Law on direct appeal from Article 16 proceedings.  *See Rice v. Power*, 224 N.E.2d 865, 865 n. 1 (N.Y. 1967).  More recently, the New York Supreme Court has resolved constitutional claims over potential candidates' designation to be on the ballot, including challenges relating to the precise COVID-19 measures Plaintiff challenges here.  *See Hawatmeh v. New York State Bd. Of Elections*, __ N.Y.S.3d __, 2020 WL 2235860, at *4 (N.Y. Sup. Ct. Albany Cty. May 6, 2020) (in an Article 16 proceeding, holding that the Governor's Executive Order 202.2 and the New York State Legislature's enactments effectuating it did not violate the petitioner's constitutional rights); *see also EH Fusion Party v. Suffolk Cty. Bd. Of Elections*, 117 N.Y.S.3d 808 (Table), 2019 WL 3922669, at *4 (N.Y. Sup. Ct. Suffolk Cty. Aug. 20, 2019) (reviewing the petitioner's constitutional challenges to provisions of the Election Law in an Article 16 proceeding).[8]

---

[8] In addition to some of the case the Court recounts here, which it reviewed on its own initiative before the May 15 hearing, at that hearing, counsel for the State Defendants provided several additional cases from both federal and New York state courts that recognized constitutional claims could be raised in an Article 16 proceeding.  *See Ferris v. Cuevas*, 118 F.3d 122 (2d Cir 1997) (applying res judicata to bar litigation of constitutional claims in federal court when the plaintiffs could have raised the claims in an Article 16 proceeding they had already litigated); *Kaloshi v. New York City Bd. of Elections*, No. 02-cv-4762, 2002 WL 31051530 (E.D.N.Y. Sept. 6, 2002) (holding that res judicata barred litigation of constitutional claims brought by candidates who had previously brought Article 16 proceedings), *rev'd on other grounds sub nom.*, *Kaloshi v. Spitzer*, 69 F. App'x 17 (2d Cir. 2003); *Saunders v. Egriu*, __ N.Y.S.3d __, 2020 WL 2461913 (N.Y. Sup. Ct. App. Div. 4th Dep't May 13, 2020) (denying a

While the Court does not decide this issue here, it appears that Plaintiff's constitutional claims may be subject to litigation in the state proceeding where they were originally raised. Plaintiff did not, however, take an appeal from that decision. [9]  Upon a motion and proper adversarial briefing of the res judicata issue here, the Court will consider its application anew.

## II.    Application for a Temporary Restraining Order

As the Court has found that no rule bars consideration of the Plaintiff's Motion here, it proceeds to the merits of the request for emergency relief.  The Court concludes that Plaintiff is not entitled to mandatory injunctive relief directing that she be placed on the ballot.

Preliminary injunctive relief, including the temporary restraining order the Plaintiff seeks here, is an "extraordinary and drastic remedy" that is "unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co.*, 409 F.3d 506, 511 (2d Cir. 2005).  The "standards which govern consideration of an application for a temporary restraining order . . . are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).

When, as here, injunctive relief would "affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3)

---

constitutional challenge on the merits in an appeal of an Article 16 proceeding).  Since these cases were cited for the first time at the May 15 hearing and were not in the Defendants' papers, Plaintiff's counsel objected to the Court's consideration of these additional cases because Plaintiff had not had an opportunity to brief them.  Since the Court does not resolve the res judicata question, it does not need to consider the Plaintiff's objection.

[9] While Plaintiff obviously was dissatisfied with the outcome of the state court action, no appeal was taken to the New York State Appellate Division.  Plaintiff's counsel claims both in his affirmation and at the May 15 hearing, *see* Reply Aff. ¶ 14-15, that he was unaware a decision had been rendered in the state court case.  However, he admits that he was aware of the Appellate Division's announced coordinated appeal schedule for all election cases, which would have required briefing and argument before mid-May 2020.  In light of that, Plaintiff's counsel had a duty to diligently monitor for the decision.  Defendants' counsel also represented at the May 15 hearing that the decision was publicly available online shortly after it was rendered.

public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (citing *Red Earth LLC v. U.S.*, 657 F.3d 138, 143 (2d Cir. 2011)).  Additionally, since Plaintiff here seeks a mandatory injunction against the government that would change the status quo existing when the case was filed (*i.e.* by adding her name to the ballot), she is subject to a heightened standard.  Namely, she must show "a 'clear' or 'substantial' likelihood of success on the merits." *Thomas v. New York City Bd. Of Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012) (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)).  This standard is specifically appropriate where, as here, the emergency injunctive relief "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *People ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).  Plaintiff's requested relief here both mandates that the government take action (a mandatory injunction) and would result in Plaintiff's receipt of her ultimate relief (*i.e.* appearing on the ballot) at the most preliminary stage of the case.  Thus, the higher standard applies.  Because Plaintiff has failed to meet this rigorous standard, she is not entitled to injunctive relief.

### A.    Irreparable Harm

The Second Circuit has made clear that a showing of irreparable harm is "the single most important prerequisite for the issuance" of injunctive relief. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see also* 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2951 (3d ed.) ("A demonstration of irreparable injury by the party seeking relief is an essential prerequisite to a temporary restraining order.").  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary

injunction they will suffer an injury that is neither remote[10] nor speculative, but actual and imminent." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

Here, Plaintiff claims that the changes to the election law burden her constitutional rights and irreparable harm will occur to her if ballots are printed and distributed without her name on them. To be sure, the Second Circuit has made clear that alleged constitutional violations presumptively constitute irreparable harm. *See Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks omitted)); *Yang v. Kellner*, __ F. Supp. 3d __, 2020 WL 2129597, at *7 (S.D.N.Y. May 5, 2020) (collecting cases).

However, there is no freestanding "right to be a candidate" in an election. *See Fulani v. McAuliffe*, No. 04-cv-06973 (LAP), 2005 WL 2276881, at *3 (S.D.N.Y. 2005) ("However, candidacy is not a fundamental right in our political system, and not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." (citing *Clements v. Fashing*, 457 U.S. 957, 963 (1982))).

Plaintiff's alleged injury here is not clearly a constitutional violation. First, Plaintiff's allegation of harm isolates one provision of the Governor's and Legislature's measures (the reduction in the number of days available to collect signatures) in isolation from the rest of the measures taken by the same law (*i.e.* the drastic reduction in the number of signatures required

---

[10] The injury about which Plaintiff complains—not appearing on the ballot—is remote from and not connected to any alleged constitutional violation. As discussed previously, Plaintiff did comply with the number of signatures required by law, but she did not comply with other requirements for her application, including the identity of the witness/signature gatherer whom her campaign hired. That requirement was not changed at all by the Executive Order or Election Law changes she challenges here. As a result, it is possible the injury here is too remote to qualify for injunctive relief. Because the Court presumes irreparable harm here though, it does not consider whether the constitutional violation as alleged is too remote from Plaintiff's alleged harm to be sufficient for injunctive relief.

for the Plaintiff to qualify for the June 23 primary) and claims a constitutional violation based only on the portion of the law she dislikes.  But, the first provision properly must be read in context with the second, as they constitute a single regulatory scheme in place to ensure the fair functioning of the election.  In light of that, and as explored more below, the Governor's Executive Order and the subsequent law enacted to ratify it likely does not constitute a constitutional violation at all.  In addition, Plaintiff's real injury, not appearing on the June 23 primary ballot despite her efforts, does not clearly arise from the measures she seeks to challenge here and which she seizes upon in an attempt to secure an injunction.  As described further below, Plaintiff gathered almost three times the required number of signatures to appear on the ballot.  However, her designating petition and all of the signatures on it were found to be invalid for noncompliance with other portions of the Election Law that were not modified by the COVID-19 response.  Instead, her "injury" is perhaps more accurately caused by party politics, since Plaintiff implies throughout her moving papers and at argument that any issues she had getting on the ballot or complying with the Election Law were a function of not having support from the local Republican Party.  *See* Pl. Br. at 5-7, 15 n. 3.

Nonetheless, the mere allegation of a constitutional violation appears to constitute irreparable harm under this Circuit's binding precedent.  *See Connecticut Dep't of Envtl. Prot.*, 356 F.3d at 231 ("[T]he alleged violation of a constitutional right triggers a finding of irreparable injury."); *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996) ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction. . . . By the very nature of their allegations, then, appellants have met the

first prong of the test.").  In that light, the Court presumes for the purposes of this motion that

Plaintiff has adequately alleged a risk of irreparable harm.[11]

### B.      Likelihood of Success on the Merits

The Court cannot find, however, that Plaintiff is "clearly" or "substantially" likely to

succeed on the merits of her claim sufficient to warrant relief.  *See Thomas*, 898 F. Supp. 2d at

597.  Election regulation laws are analyzed under a balancing test derived from *Anderson v.*

*Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).  The level of

scrutiny applied to the challenged regulation is determined by balancing  "the character and

magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments

that the plaintiff seeks to vindicate" with the "precise interests put forward by the State as

justifications for the burden imposed by its rule.  In passing judgment, the Court must not only

determine the legitimacy and strength of each of those interests; it also must consider the extent

to which those interests make it necessary to burden the plaintiff's rights."  *Anderson*, 460 U.S. at

789.  If, as a result of the balancing, the Court finds the Plaintiff's rights are "subjected to severe

restrictions, the regulation must be narrowly drawn to advance a state interest of compelling

importance"—that is, survive strict scrutiny.  *Burdick*, 504 U.S. at 434 (citation omitted).  If,

however, the Court finds that the "state election law provision imposes only reasonable,

nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the

---

[11] Plaintiff also alleges a violation of her constitutional rights as a result of the law enacted following the Governor's Executive Order because it eliminated the "opportunity to ballot petition."  *See* Cpl. ¶ 40.  However, no harm could occur from that action because Plaintiff would not have the ability to file such a petition for this election in any event.  Opportunity to ballot petitions are only available in an election for which there is no candidate on the ballot whatsoever.  *See Bowen v. Ulster Cty. Bd. of Elections*, 21 A.D.3d 693, 694 (N.Y. App. Div. 3d Dep't 2005) (The 'opportunity to ballot' . . . was designed to give effect to the intention manifested by qualified party members to nominate some candidate, where that intention would otherwise be thwarted by the presence of technical, but fatal defects in designating petitions, leaving the political party without a designated candidate for a given office.").  As the State Defendants point out in their Opposition, the Republican primary for the Fourteenth Congressional District does have one candidate on the June 23 ballot.  *See* State Opp. at 18 n. 19.  As a result, Plaintiff does not have a right, with or without the challenged COVID-19 measures, to file an opportunity to ballot petition.

State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (citation omitted).

In this case, as described below, the Court finds that the state restrictions on Plaintiff's ballot access, in light of all the changes that were made, do not severely burden Plaintiff's rights. *Accord Rivera-Powell v. New York City Bd. Of Elections*, 470 F.3d 458, 469 n. 15 (2d Cir. 2006) ("[C]andidates' and voters' associational and voting rights are qualified ones. Many restrictions, such as signature requirements, not only do not burden voters' constitutional rights to associate, but are, as a practical matter, necessary to ensure the orderly functioning of elections." (internal citations omitted)).  As a result, strict scrutiny does not apply here.[12]

The dispositive inquiry under the *Anderson-Burdick* analysis is therefore whether the challenged restrictions are reasonable and non-discriminatory.  The Court finds that the restrictions, which further the State's important interest in protecting public health without undermining the State's further interest in ensuring the orderly conduct of elections, were reasonable and non-discriminatory.  Plaintiff is thus not likely to succeed on her claims.

To begin, Plaintiff asserts a violation of her right to be a candidate in the June 23 primary election.  As noted, Plaintiff does not have a fundamental right to appear on a ballot as a

---

[12] Even if strict scrutiny were to apply here, it seems likely that the measures would survive.  Courts have held that the Government's interest in minimizing the spread of deadly infectious disease is a compelling state interest.  *See, e.g.*, *Caviezel v. Great Neck Public Schools*, 701 F. Supp. 2d 414, 428 (E.D.N.Y. 2010) (recognizing "settled law" that governments have a compelling interest in protecting the public from contagious diseases through inoculation programs (citing *Sherr v. Northport-East*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987))); *Ware v. Valley Stream High Sch. Dist.*, 550 N.E.2d 420 (N.Y. 1989) (recognizing a compelling interest in combatting AIDS).  The Court would then have to consider whether the measures the New York government took were narrowly tailored to that interest.  The New York measures already have been tacitly endorsed by another Court considering whether a COVID-19 stay-at-home order severely burdened candidates' ability to collect signatures and seeking narrowly-tailored relief for candidates there.  *See Esshaki v. Whitmer*, __ F. Supp. 3d __, 2020 WL 1910154, at *10 (E.D. Mich. Apr. 20, 2020) ("[T]he governments of the several states have searched for solutions to protect their citizens' health, while at the same time preserving fundamental democratic processes and liberties.  In New York, Governor Andrew Cuomo, confronted with the same issue that is before this Court, reduced the number of petition signatures candidates would be required to obtain to thirty percent of the statutory requirement.").  And, a constitutional challenge to the identical measures at issue here was rejected by the New York State Supreme Court in *Hawatmeh v. New York State Bd. of Elections*, 2020 WL 2235860.  The New York measures here likely would survive strict scrutiny.

candidate.  Instead, she has a right to campaign in an attempt to qualify to appear the June 23

ballot.  *Cf. Rivera-Powell*, 470 F.3d at 469 n. 15.  On the other hand, the State has asserted a

strong public health and safety interest in minimizing to the extent possible person-to-person

contact during the COVID-19 pandemic.  Executive Order 202.2 and the state legislative

enactments served to prevent seventeen additional days of door-to-door campaigning by

Plaintiff, her employees, and volunteers (as well as other candidates and their campaigns) while

the outbreak of COVID-19 in New York City was to climbing exponentially.  Indeed, publicly

available data shows that both New York City's COVID-19 hospitalization and death rates were

climbing rapidly in the end of March and peaked during the first week in April, when Plaintiff

would have been campaigning and submitting her designating petitions.  *See COVID-19: Data*,

New York City Department of Health, https://www1.nyc.gov/site/doh/covid/covid-19-

data.page.[13]  Controlling the spread of the disease in order to contain the pandemic, minimize

deaths, allocate scare hospital resources, and prevent a larger public health catastrophe (with its

attendant other negative impacts on society) is a powerful compelling government interest.  *See*

*Friends of DeVito v. Wolf*, No. 68-mm-2020, 2020 WL 1847100, at *24 (Pa. Apr. 13, 2020)

("There is no question that the containment and suppression of COVID-19 and the sickness and

death it causes is a substantial governmental interest."); *see also Workman v. Mingo Cty. Bd. of*

*Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) (collecting cases regarding the interest of states in

controlling the spread of communicable diseases).

Additionally, though certainly secondary to the public health interest, the Government

has a recognized interest in conducting well-regulated elections.  *See Burdick*, 504 U.S. at 569 n.

---

[13] While the Court is generally confined to the facts in the Complaint and supporting papers, the Court may take notice of information which is not reasonably disputed as untrue, such as the government's publication of COVID-19 hospitalizations and fatalities.  *See Mosdos Chofetz Chaim, Inc. v. Villiage of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (citing *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

10 (discussing the government's right to require candidates for election to comply with election law requirements); *Prestia v. O'Connor*, 178 F.3d 86, 88 (2d Cir. 1999) ("States have an important interest in 'requiring some preliminary showing of a significant modicum of support' before printing a candidate's name on the ballot, so as to 'avoid[ ] confusion, deception, and even frustration of the democratic process at the general election.'" (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971))).  Requiring Plaintiff to gather some valid signatures to access the ballot as a candidate furthers that interest, *see Rivera-Powell*, 470 F.3d at 469 n. 15 (2d Cir. 2006) ("Many restrictions, such as signature requirements, not only do not burden voters' constitutional rights to associate, but are, as a practical matter, necessary to ensure the orderly functioning of elections." (internal citations omitted)), while further reduction or elimination of the signature requirement would undermine it.  Plaintiff's claim that the election requirements constitute a cognizable harm, along with the relief she seeks, would functionally eliminate the signature requirement as to her, since both the New York City Board of Elections and the New York State Supreme Court have found that she gathered no valid signatures for her designating petition.

Balancing the alleged burden on Plaintiff's rights against the competing interest of the State, the measures taken through Executive Order 202.2 and the legislation that followed were reasonable and non-discriminatory, especially when the substance of the challenged modifications to the Election Law are carefully scrutinized.  As the State Defendants convincingly argue, the government's COVID-19 measures not only limited the number of days to campaign and gather signatures, but also drastically reduced the number of signatures any candidate needed to appear on the ballot.  *See* State Opp. at 20-21.  In so doing, the State recognized that curtailing the time in which to collect signatures could be harmful absent a corresponding reduction in the number of signatures required.  Based on the record before the

Court, such measures were undoubtedly "reasonable and nondiscriminatory," such that the State's interest in promoting public health, along with the parallel interest in ensuring a well-functioning election, more than satisfies the *Anderson-Burdick* standard.

Neither of the COVID-19 specific cases upon which Plaintiff relied provide any support for Plaintiff's application. *See* Pl. Br. at 12-17. In *Esshaki v. Whitmer*, __ F. Supp. 3d __, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020), the plaintiffs sought to enjoin enforcement of Michigan's unmodified requirement that candidates get 1,000 signatures to be eligible to appear on the ballot. *Id*. at *1. Michigan's Governor issued a stay-at-home order, which the plaintiffs there claimed led to their inability to gather signatures, after it went into effect more than a month before signatures were due. *Id.* at *2-*3. In Michigan, unlike New York, where the stay-at-home order was accompanied by a massive reduction of over 70 percent in the number of signatures ultimately required to appear on the ballot, there was no reduction in the number of signatures required to appear on the Michigan ballot. *Id.* Indeed, the reduction in the number of signatures required by the injunction granted in *Esshaki* is actually smaller than the reduction the New York state government implemented on its own to counter the impact in the challenged reduction in the number of days to collect signatures under Executive Order 202.2.

The second case on which Plaintiff relies, *Goldstein v. Secretary of Commonwealth*, 142 N.E.3d 560 (Mass. 2020), is even less supportive of Plaintiff's position. There, similar to Michigan, a stay-at-home order was implemented without any reduction in the number of signatures required to appear on the Massachusetts primary ballot. *Id.* at 565-66. The Massachusetts state government had proposed but never enacted any modifications to that requirement. *Id.* at 568. The proposals that had been suggested would have reduced the signature requirement by 50 percent or two-thirds, depending on the office the candidate was

seeking.  *Id.*  The Defendant Massachusetts Secretary of the Commonwealth did not contest that

the unmodified requirements did impose a severe burden on the rights of the plaintiffs.  *Id.* at

571.  As a result, the Massachusetts Supreme Judicial Court issued an injunction granting the 50

percent reduction and extending the deadline for gathering signatures, but only to a pre-existing

alternative deadline that was already in effect for some Massachusetts candidates.

(Massachusetts has different deadlines for submission of signatures by local candidates and by

statewide or federal candidates.)  *Id.* at 574-75.

Unlike Massachusetts, New York's scheme significantly reduced the number of

signatures required and set a date for all candidates to submit designating petitions.  Any

gamesmanship possible in the Massachusetts primaries which could motivate an injunction is not

present here.  Simply put, New York's COVID-19 response measures were markedly different

from other states in that it was proactive in changing the state's ballot access measures to account

for the pandemic.  In light of that, the court cannot find Plaintiff is likely to succeed on the merits

of her claim.[14]

Moreover, Plaintiff's claims are only likely to succeed if the remedy she seeks is likely to

be granted.  *Cf. V.D. v. State of New York*, 403 F. Supp. 3d 76, 87 (E.D.N.Y. 2019) ("In order to

demonstrate a likelihood of success on the merits, plaintiffs are not required to show that success

on their complaint is an absolute certainty, but rather that the probability of success is better than

fifty percent." (internal quotation marks omitted)).  Any injunctive relief the Court grants must

be "narrowly tailored to address specific harms."  *Brooks v. Giuliani*, 84 F.3d 1454, 1467 (2d

Cir. 1996).

---

[14] The other COVID-19 cases on which Plaintiff relies on are similarly unavailing.  *See* Pl. Br. at 16.  As Defendants
asserted at the May 15 hearing, none of the state measures at issue there made any prospective reduction in the
number of signatures required to appear on the ballot as New York did.

Here, the relief Plaintiff requests is remote from any of the alleged harm.  The harm Plaintiff allegedly suffered here is a restriction on her purported constitutional right which, practically speaking, was the loss of seventeen days in which she could continue to collect signatures for her designating petition.  Plaintiff asks for the broad remedy of an injunction requiring the government to put her name on the ballot for the June 23 primary.  In so arguing, Plaintiff seemingly asserts that but-for the allegedly unconstitutional actions taken here she would be on the ballot.  That is not true.  The Court understands that the primary issue with Plaintiff's designating petition signatures was the identity of the signature collector/witness.  *See* State Court Decision at 2-3.  Specifically, he was not a registered member of the Republican Party, which the Election Law requires for witnesses of signatures for a Republican Party primary designating petition.  *See* N.Y. Election Law § 6-132(2); *see also* State Court Decision at 2-3.  As a result, all of the signatures the ineligible witness collected were declared invalid.  *See* State Court Decision at 2-3.  Nor would the deficiency have been cured if Plaintiff had been allowed more time for her invalid collector/witness to seek additional signatures.  In addition, the New York City Board of Elections found other fatal deficiencies as well.  *See id.* at 1.  Those defects resulted from Plaintiff's noncompliance with portions of the Election Law which were wholly unaffected by the modifications Plaintiff challenges.  *See* State Opp. at 17-18.

In order to be eligible to appear on the primary ballot (*i.e.* obtain the relief she seeks in this motion/action), Plaintiff would need to comply with all portions of the Election Law, including those not modified this year, and withstand challenges from any objectors.  Plaintiff does not challenge these other measures here, and as a result, the Court cannot find it likely that will succeed on the merits.  *See Rivera-Powell*, 470 F.3d at 468-69 (finding no likelihood of

success where the Plaintiff did not challenge the other election law provisions with which she would have to comply if her constitutional challenge succeeded).

### C.    Balancing the Public Interest

Plaintiff has made no attempt, as she must, to show that the "public interest weigh[s] in favor of granting the injunction." *See Thomas*, 898 F. Supp. 2d at 597.[15]   Indeed, as discussed above, in light of the facts of this case, the state's (and public's) compelling interest in controlling the spread of a fatal pandemic outweighs any burden on Plaintiff's interest in her name appearing on the ballot.  Specifically, the Governor's Executive Order and the State Legislature's enactments aimed to prevent campaign employees and volunteers from going to voters' homes to interact with them and request designating petition signatures in-person during the COVID-19 pandemic.  This was a reasonable restriction in light of the overwhelming evidence of interpersonal transmission and the seriousness of the COVID-19 disease.

The public interest is also served by developing and adhering to an election regulation regime developed by the New York State and City Boards of Elections and not by the Court. Simply, the elections authorities have more expertise in what measures constitute sufficient maintenance of the state's interest in running well-functioning elections.

Relative to those interests, Plaintiff's burden is small.   Plaintiff had more than enough signatures to meet the threshold for designation for the ballot.  However, because Plaintiff hired a campaign employee to collect signatures who was ineligible to do so, her designating petition was invalid.  In light of this (and other deficiencies in the petition), it is not at all clear that she could have succeeded even if given more time to collect additional signatures.  Clearly, to allow

---

[15] Indeed, Plaintiff does not even meet the lesser standard for other types of temporary injunctive relief that would require her to show a balance of hardships or equities tipping in her favor. *See Moore*, 409 F.3d at 510 (2d Cir. 2005).

her to do so would threaten spreading the COVID-19 disease and would unwillingly expose those from whom she sought signatures to fatal risk from an uninvited knock on his or her door. This is a particularly acute issue in New York City where Plaintiff lives and is campaigning, as New York City (most particularly the relevant district neighborhoods of Queens and Bronx counties) has been the hardest hit region of the country during the pandemic, and efforts to reopen or stem the tide had not yet been successful when the challenged modifications to the election procedure were enacted.  *See* State Opp. 24-25.  The public interest would not be served by crediting Plaintiff's challenge to a reasonable and non-discriminatory health-related change to election procedures.

Public interest also would not be served by rewarding Plaintiff's tactics here.  First, Plaintiff's counsel has seemingly ignored the progress of Plaintiff's state litigation.  Counsel, who also represented Plaintiff in the state court Article 16 proceeding, admitted at the May 15 hearing to failing to diligently monitor the proceedings in the case, leaving him unaware of the state court decision.  As a result, he failed to appeal that decision.  This is despite counsel's assertion that he was aware months ago that the New York Court of Appeals and Appellate Division had published consolidated appeal calendars for election cases that required swift action.  Second, while the Plaintiff's delay in this case does not necessarily rise to the level of laches, *see* City Opp. at 6-8, Plaintiff waited almost two months until May 7, 2020 to file this case, even though the measures she challenges were enacted on March 14, 2020, and the state legislative ratification of the Governor's Executive Order was signed into law on March 18, 2020.  The Court compares the timeline here to the recent *Yang* case decided by Judge Torres of this Court.  There, the Plaintiff sought emergency relief less than a day after the election-related COVID-19 measures at issue in that case were announced.  *See Yang*, 2020 WL 2129597, at *2-

27

*3.  Plaintiff's delay here, especially as compared to the *Yang* plaintiffs, is notable because she has not taken any appeal from her state court loss.  Public interest does not weigh in favor of granting Plaintiff's injunctive relief.

Moreover, the public interest would be disserved by granting Plaintiff injunctive relief, since it would impose significant expense and burdens on the government and public, burdens which were also increased by the delay in Plaintiff's application.  Plaintiff's requested relief might require the New York City Board of Elections to expend substantial funds to reprint ballots already mailed overseas or to the military, or to jeopardize the ability to conduct mandatory testing of election equipment or ballots. [16]  *See* City Opp. at 7.

Plaintiff has already had her day in Court with regard to her inability to qualify to appear on the ballot.  The public interest is served by respecting the State's interest and expertise in regulating elections and by respecting the state court's decision here, not by sanctioning duplicative litigation which is likely to impose severe costs on Defendants if it proceeds.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a temporary restraining order is DENIED.

**SO ORDERED.**

Date:  **May 16, 2020**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

---

[16]  At the May 15 hearing, the General Counsel of the New York City Board of Elections, appearing on behalf of the Board, proffered details regarding the already completed printing and mailing of overseas and military ballots and the extensive testing of voting equipment the Board of Elections will begin to undertake as soon as this weekend to prepare for the June 23 primary.